272 B.R. 897 (2001)
In re COMPUTER LEARNING CENTERS, INC., Debtor.
No. 01-80096-RGM.
United States Bankruptcy Court, E.D. Virginia, Alexandria Division.
December 18, 2001.
*898 *899 *900 Robert O. Tyler, Scott J. Newton, Tyler, Bartl, Burke & Gorman, P.L.C., Alexandria, VA, for Computer Learning Centers, Inc.
Alexander McDonald Laughlin, Dylan Gillespie Trache, Raymond R. Pring, Jr., Gold, Morrison & Laughlin, PC, McLean, VA, Joel S. Aronson, Ridberg, Press & Sherbill LLP, Bethesda, MD, for H. Jason Gold.
Dennis J. Early, Frank J. Bove, Office of the U.S. Trustee, Alexandria, VA, for W. Clarkson McDow, Jr., 11.
Joseph Benstock, Los Angeles, CA, pro se.

MEMORANDUM OPINION
ROBERT G. MAYER, Bankruptcy Judge.
The issues before the court concern the retention and compensation of special counsel to the chapter 7 trustee. Computer Learning Centers, Inc. ("CLC") filed a voluntary petition in bankruptcy pursuant to chapter 7 of the Bankruptcy Code on January 25, 2001. Immediately prior to filing, it provided computer-related training to more than 9,000 students and employed more than 1,600 people at 25 schools located throughout the United States. Classes were suspended three days before the filing. The employees quit. Rent accrued at the rate of more than a million dollars a month. There were no funds available to operate the schools. Time was of the essence.
A chapter 7 trustee was immediately appointed. He sought to sell the schools as going concerns before they completely collapsed. He organized and conducted a sealed bid auction. It was extensively publicized. The publicity included national newspaper advertising in the Wall Street Journal, the Washington Post, the Chronicle of Higher Education, and other newspapers; direct mailings to more than 8,740 computer instruction companies, 5,000 computer dealers and 4,000 commercial leasing brokers; an extensive internet marketing effort; and an aggressive telemarketing campaign. The auction was exceptionally successful. He received 47 bids from 27 different bidders. Most of the bids were for the schools on a going concern basis. This was critical because the sales as going concerns not only maximized the value of the assets but also minimized potential student claims by permitting the students enrolled in the schools to complete their studies with minimal interruption and minimized lease rejection claims. At the time of filing, the debtor estimated that the liquidation value of its assets was $6 million. To date, the trustee has received about $27 million.[1]
*901 In the course of the administration of the case, the trustee was authorized to retain five law firms to represent the estate.[2] An application to employ a sixth law firm is pending. The trustee was also authorized to employ an auctioneer and a certified public accountant. Eighteen fee applications seeking $3,238,463.10 in professional and trustee fees and $149,138.08 for expenses have been filed. Fees in the amount of $1,653,492.30 and expenses in the amount of $81,181.85 have been awarded. Requests for fees totaling $1,048,180.71 and expenses totaling $22,137.87 have been denied. This opinion addresses the application to employ a sixth law firm and two fee applications.

I. Application to Employ McKenna & Cuneo

A. The Employment Application
The trustee seeks to employ a sixth law firm. The firm, McKenna & Cuneo, LLP, is proposed to be retained as special counsel to assist the trustee with respect to insurance matters. The application states that the bankruptcy estate is the owner of "certain insurance policies insuring the Debtor and its operations" and that the trustee believes that the polices "covered claims and losses for which the respective insurance carriers either failed or refused to cover." Application, ¶¶ 4, 5 (Docket Entry 424). No additional information was given about the matters to be referred to counsel. The individual attorney sought to be retained is Robert L. Carter, Jr., a 1990 graduate of the Columbus School of Law at Catholic University and co-chair of the firm's 15-attorney Insurance Recovery Group. His hourly rate is $375.00. The trustee and the firm proposed compensation at the reduced hourly rate of $200.00 plus a contingent fee of one-third of any amounts recovered for the benefit of the debtor. This fee arrangement was an "effort to minimize the professional expenses relating to the Debtor's insurance coverage issues." Application, ¶ 14.
The application was properly noticed. No objections were filed. The trustee submitted a proposed order endorsed by the United States Trustee granting the application. The court set the application for hearing noting that neither the specific nature nor scope of the proposed representation was identified; that the basis for the contingent fee was unclear, particularly in that the amounts in controversy and the risks involved were not articulated; and that the proposed reduced hourly rate exceeded the hourly rate of many practitioners *902 in the Northern Virginia legal community.
The trustee filed a supplemental memorandum addressing some of the court's concerns. He elaborated on the proposed representation. The trustee stated that when he first approached McKenna & Cuneo:
[T]he insurance situation for CLC was in disarray. The Trustee did not know:
(1) what insurance policies were in place;
(2) for the claims-made insurance policies, whether extended reporting periods should be purchased to allow the estate to report claims after the termination of the policies;
(3) whether notice had been given for all appropriate claims under the policies;
(4) whether any of the lawsuits against CLC were covered under the policies;
(5) what had been paid by the insurers under the policies;
(6) what premium refunds may be owed under the policies;
(7) whether any claims against CLC were covered under the policies;
(8) whether any insurers had improperly denied coverage under the policies;
(9) whether any insurers had improperly refused to pay defense costs under the policies; and
(10) whether the insurance broker had carried out its duties and obligations to CLC.
The Trustee sought McKenna & Cuneo's assistance in answering the questions set forth above and any other insurance related issues they could uncover. In short, the Trustee sought to have McKenna & Cuneo identify potential sources of insurance recovery and then pursue that recovery for the benefit of CLC's estate.
Supplemental Memorandum at 1-2 (Docket Entry 476) ("Supp.Memo.").
McKenna & Cuneo, as of the date of the supplemental memorandum, had already "assembled the various insurance policies, interviewed the insurance brokers, and recommended the purchase of extended reporting periods." Supp.Memo. at 3. The firm had also assembled and analyzed the papers in various lawsuits to determine whether defense costs were recoverable under any of the policies.
The trustee anticipated that after the law firm identified potential recoveries the law firm would pursue them through "negotiations, discussions of specialized legal issues, and if necessary, litigation." Supp.Memo. at 3. With two exceptions, no specific matters were identified. The first matter identified concerns the directors' and officers' liability policy  whether two separate lawsuits arising out of the same wrongful act are a single claim subject to the "per claim" policy limit of $5 million or are two claims, thereby effectively increasing potential coverage for the wrongful act to $10 million. The trustee stated, "The significance of that interpretation may mean the difference between $5 million and $10 million available to the estate." Supp.Memo. at 3. Later in his supplemental memorandum, the trustee stated, "Until a thorough investigation is completed, the Trustee cannot determine the amount in controversy." Supp.Memo. at 4. The second potential matter identified was a defense-cost reimbursement claim of $500,000. He did not elaborate on the claim. It is not known whether a claim has been filed or whether it is or is likely to be contested. A list of 21 suits to which CLC had been a party within three years prior to the filing of the petition was attached to the supplemental memorandum. *903 No additional information was presented at the hearing on the application.

B. The Standard for Employment
The trustee, subject to the court's approval, has broad discretion in his selection of counsel and the terms of employment. There are, however, two threshold requirements that the trustee must satisfy. First, the trustee must demonstrate that the attorney proposed to be employed meets certain statutory standards. See, e.g., 11 U.S.C. § 327(a) (disinterestedness); 11 U.S.C. § 327(f) (disqualification of prior examiner); Harold & Williams Development Co. v. United States Trustee (In re Harold & Williams Development Co.), 977 F.2d 906, 910 (4th Cir.1992). Second, the employment must be reasonably necessary. See 3 Collier on Bankruptcy, ¶ 327.02[1] (15th ed.2001). If the threshold matters are satisfied, the trustee's selection should not be lightly disregarded by the court. "The relationship between attorney and client is highly confidential, demanding personal faith and confidence in order that they may work together harmoniously." Palmer v. Kennedy (In re Mandell), 69 F.2d 830, 831 (2nd Cir.1934). In Palmer, the attorney selected by the trustee represented a large creditor of the estate. The district court denied the requested appointment and substituted another attorney of the court's selection. The Second Circuit found that the denial of the application was proper but that "no reason appears why the trustee should not have been allowed to nominate another attorney satisfactory both to himself and to the court." Id. at 831. See also In re Allard, 23 B.R. 517 (E.D.Mich., 1982).
The court exercises its discretion in reviewing employment applications. It should exercise its discretion in a manner that:
best serves the objectives of the bankruptcy system. Among the ultimate considerations for the bankruptcy courts in making these decisions must be the protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding.
Harold & Williams, 977 F.2d at 910. To achieve this, the court must be able to determine the scope of the proposed employment, the reason why it is necessary, how it may benefit the estate and the projected cost.

C. The Trustee's Reasons for Employment
The trustee must be able to articulate the reasons why counsel is necessary and why he selected the particular applicant. Fed.R.Bankr.P.2014(a). See In re Abraham, 163 B.R. 772 (Bankr.W.D.Tex.1994).[3] Here, the trustee has properly identified insurance policies as assets of the bankruptcy estate and potential sources of funds for the estate. But, he has neither sufficiently articulated a reason for hiring counsel nor adequately defined the scope of employment.
It is well established that counsel or another professional may not be hired by the estate or compensated at the expense of the estate to perform the trustee's duties. 11 U.S.C. § 328(b),[4]United States Trustee v. Porter, Wright, Morris & Arthur (In re J.W. Knapp Company), 930 *904 F.2d 386, 388 (4th Cir.1991) ("[C]ourts may not compensate an attorney for services statutorily required by the trustee.") In order to avoid this problem,
courts consistently have requested that the demarcation between the trustee's services and the attorney's services be clear and distinct in the attorney's application, and that the specific subject matter and the nature of the problem that implicated legal services be apparent from the records.
In re King, 88 B.R. 768 (Bankr.E.D.Va.1988) (Bostetter, C.J.). See also In re Perkins, 244 B.R. 835, 838 (Bankr.D.Mont.2000); In re Shades of Beauty, Inc., 95 B.R. 17, 18 (E.D.N.Y.1988); In re McKenna, 93 B.R. 238, 241 (Bankr.E.D.Cal.1988).
This application seeks to retain counsel to perform the trustee's administrative duties. "Trustees must perform all ministerial and administrative duties of the estate." King, 88 B.R. at 770 (citations omitted). It is the trustee's responsibility to assemble insurance policies, file claims, and, in the first instance, seek payment from the insurance companies. King, 88 B.R. at 770. ("[A]ttorneys have been denied compensation for . . . arranging insurance coverage for the estate" and for examining the debtor's books and records.) (citing In re McAuley Textile Corp., 11 B.R. 646 (Bankr.D.Me.1981)). It is the trustee's duty to determine what insurance policies are in place, what notices of claims have been given, and what claims have been paid. He initially looks into whether refunds are due, whether there are claims under the policies that have not been paid or asserted, and whether any submitted claims have been erroneously or wrongfully denied. These are all typical business activities that any businessperson would, in the first instance, undertake. All fall within the trustee's administrative duties. 11 U.S.C. § 704(4) ("investigate the financial affairs of the debtor"). All are "trustee's duties that are generally performed by a trustee without the assistance of an attorney or accountant." 11 U.S.C. § 328(b). They do not require professional legal skills or expertise beyond the ordinary knowledge and skill of a trustee. King, 88 B.R. at 770 ("[A]ttorneys appointed to represent the trustee must exercise professional legal skills and expertise beyond the ordinary knowledge and skill of the trustee to receive compensation.") The services identified in the application and the supplemental memorandum do not support employment of counsel.[5]

D. The Scope of Employment and Compensation
The scope of counsel's employment  whether general or special  is usually apparent *905 from the reasons giving rise to counsel's employment. However, the reasons for the employment and the scope of the employment are distinct. The reasons for the appointment justify the appointment and are generally found in the employment application. The scope of the employment describes with some specificity what counsel is to do and is generally found in the employment order. While the scope of employment flows from the reasons necessitating the appointment, they are not identical. In this case, until the trustee has completed his work and laid the foundation for the appointment of special counsel, the court cannot review the scope of the proposed representation or the reasonableness of the proposed compensation.
A well-defined scope of employment is essential. King, 88 B.R. at 770. It identifies the tasks to be accomplished, permits the trustee to properly manage the professional, and enables the court to properly evaluate a later fee application. Here, the law firm is sought to be employed as special counsel under § 327(e). A vague description, such as to "identify potential sources of insurance recovery," is inconsistent with § 327(e) which permits appointment of counsel only for "a specified purpose." A vague description is susceptible to an expansive  even an unlimited  interpretation which is at odds with the appointment of special counsel.[6] The description also blurs the distinction between the trustee's duties that may not be delegated to the professional and the professional's work. It is open-ended and permits the professional to roam far and wide.
The failure to establish the professional's objectives also prevents the court from effectively reviewing the proposed compensation. There are two aspects to the review in this case. The first is whether retaining an attorney engaged in a specialized area of the law, at higher rates, is necessary. The second is whether the proposed contingent fee is reasonable. While the selection of a particular lawyer is within the sound business judgment of the trustee and will not normally be upset, it must be balanced with his duties to properly manage the estate's assets and to efficiently and expeditiously resolve the bankruptcy proceeding. Yadkin Valley Bank & Trust Co. v. McGee (In re Hutchinson), 5 F.3d 750, 752-754 (4th Cir.1993); Harold & Williams, 977 F.2d at 910. See also 11 U.S.C. § 704(1). Simply stated, the trustee must be sensitive to the cost of professional services. He should seek counsel who can competently represent the estate at a reasonable rate, which will usually be the prevailing market rate. Ballard v. Schweiker, 724 F.2d 1094 (4th Cir.1984). If counsel is not available in the local community, the trustee may expand his search beyond the local area. If specialized counsel is necessary at higher rates, the prevailing rate of the specialized bar will be a factor in setting a reasonable rate. In re Geofreeze Corporation, 50 B.R. 200 (Bankr.E.D.Va.1985) (Bostetter, J.).
Here, the regular hourly rate of the proposed attorney is $375.00. This is far in excess of the typical hourly rate in the Northern Virginia legal market. The trustee states that, "Rates for insurance coverage counsel with McKenna & Cuneo's *906 expertise may exceed $500 per hour in the Washington, D.C. legal market." Supp.Memo. at 5. Be that as it may, until the trustee completes his initial review, it is impossible to determine what counsel will be retained to do, whether specialized counsel is appropriate, and whether other counsel is available in the local community. In re Nova Real Estate Investment, 25 B.R. 252 (Bankr.E.D.Va.1982) (Bostetter, J.).
The second issue relating to compensation is whether the proposed contingent fee is reasonable. A contingent fee is, as the trustee suggests, a device to control expenses and allocate risk. The classical contingent fee balances the risk to the client of paying large legal fees with the risk of losing the case. In return for eliminating legal fees if the case is lost, the client pays a premium if the case is won. It is not appropriate in every case and when proposed, the terms must be carefully reviewed. Information about the proposed undertaking is necessary to determine potential legal fees under a traditional hourly fee agreement, the likelihood of prevailing, and the magnitude of the recovery.
A trustee's review of the proposed suit normally generates the information needed to evaluate a contingent fee proposal. Here, the record is devoid of any information that would permit an informed evaluation. The trustee identified only two potential issues. The first relates to the interpretation of the director's and officer's liability policy. He candidly states that the answer to this question is the difference between $5 million and $10 million. There are several factors missing. The first is risk. If the claim is clearly covered by the insurance policy, there is no risk in recovering the first $5 million. The risk is one of contractual interpretation, that is, whether the policy limit is $5 million or $10 million. In this instance, the proposed contingent fee could range from $1.67 million to $3.33 million depending on the outcome of the contractual interpretation argument. It is not clear what benefit the estate derives from a contingent fee that includes the recovery of the first $5 million. The second factor missing is the fee that would likely be incurred under a traditional hourly retainer. If the issue is one of contractual interpretation, is it reasonably likely to take more than 4,000 hours of legal services?[7]
The trustee also identified a potential defense cost recovery of $500,000. Again, there is no information to evaluate the proposed fee arrangement. It is not known if a claim was timely submitted; whether, if submitted, it was denied; and if denied, why it was denied. It is not possible to evaluate the risks to the estate of proceeding with the proposed matter or the benefits that may be attained.
The record in this case is insufficient to allow the court to approve the employment. The trustee may submit a new application when he can reasonably identify the need for counsel, the specific tasks requiring counsel, and the basis for the proposed compensation.

*907 II. Pepper Hamilton Fee Application

Pepper Hamilton's renewed first interim fee application requests legal fees in the amount of $53,256.50 and expenses of $426.48 for the period from April 11, 2001 through August 6, 2001.[8] The court reviewed the time records in light of the statutory factors set out in § 330 and the judicial factors set out in Blum v. Stenson, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) and Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974) as explained in Daly v. Hill, 790 F.2d 1071 (4th Cir.1986), Ballard v. Schweiker, 724 F.2d 1094 (4th Cir.1984), Arnold v. Burger King Corporation, 719 F.2d 63 (4th Cir.1983) and Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir.1978). While none of these cases was a bankruptcy case, Harman v. Levin, 772 F.2d 1150 (4th Cir.1985) makes clear that the same factors are to be considered in fee applications for professionals in bankruptcy cases.
The two weakest aspects of the fee application are the absence of information permitting the court to determine the reasonableness of the time devoted to the various tasks and the necessity of the services. Section § 330(a)(3)(A) and (D) of the Bankruptcy Code require information as to the task itself and the relationship of the task to the overall bankruptcy case. An unimportant task that cannot reasonably be expected to result in any significant recovery to the estate or avoidance of liability by the estate cannot command disproportionate resources. That is, the trustee cannot spend $10,000 to recover *908 $2,000, viewed at the time the services are rendered.[9] Many times, the task itself, its overall parameters and its relationship to the bankruptcy case are self-evident, or at least, apparent from the time records and the pleadings in the case. That is not the case with respect to the matters denoted as "KMO-361 Realty Associates" and "Employment Law Matters." The application itself does not describe the nature of the cases or the amount in controversy. This information is necessary to evaluate the novelty and difficulty of the issues presented, the complexity of the cases, the desirability or undesirability of accepting the representation, and the reasonableness of the amount of time expended.
Counsel provided additional information with respect to the KMO-361 matter at the hearing on the fee application. This information together with the complaint filed in this court on November 14, 2001, and the proof of claim filed on behalf of KMO-361 Realty Associates provide sufficient information to permit the court to fully consider this aspect of the fee application. Upon consideration the court will approve the fee requested with respect to this matter, subject to adjustment at the conclusion of the representation.[10]
Counsel was given leave to file a supplemental memorandum with respect to the Employment Law Matters. The memorandum assists the court in reviewing the Employment Law Matters portion of the fee application. It, however, raises questions concerning the necessity of the services rendered. The burden of proof with respect to a fee application is on the applicant Perkins, 244 B.R. at 838; McKenna, 93 B.R. at 242; King, 88 B.R. at 770-71 ("The burden, however, is entirely on the attorney requesting compensation to justify the services rendered.").
The supplemental memorandum reflects that there were five employment related complaints pending when CLC filed bankruptcy on January 25, 2001. Three complaints were pending before state or local human rights agencies and two had matured into actual law suits pending in federal court. Pepper Hamilton contacted CLC's pre-petition counsel in the matters, discussed the cases with them, and obtained their files. Pepper Hamilton evaluated the merits of the cases, communicated with the human rights agencies involved, and sought dismissal or abatement of the investigations. Two human rights agency investigations were terminated, one because *909 the agency does not pursue cases against businesses that have closed. The third agency stated that it would not abate its investigation, but has not pursued it to date. The two law suits were stayed by virtue of 11 U.S.C. § 362. Counsel stated that all five matters were weak, that notice should be given under CLC's employment practices insurance coverage, and that a proof of claim was filed by only one of the claimants.
The time records lumped all five employment matters under one billing task. It is not entirely clear how much time was spent on each task. About 40% of the time is not clearly allocable to any particular matter and could apply to any or all of the employment matters. The time not allocable to particular matters includes communications with the trustee and the preparation of the omnibus letter to the trustee, apparently concerning the merits and status of the five matters.[11] Of the time that can be allocated to particular matters, it appears that four of the five matters consumed approximately equal amounts of time while the fifth consumed very little time.
The first question with the Employment Law Matters portion of the fee application is whether Pepper Hamilton performed trustee duties. One of the trustee's duties is to determine what litigation is pending and preliminarily evaluate it. He should initially communicate with the debtor's existing counsel to obtain the status of pending legal matters and, if appropriate, the files relating to them. He needs to determine the urgency of the pending legal matters, whether they are subject to the automatic stay and whether the matter should be removed to the bankruptcy court. While he may need the assistance of counsel to fully evaluate the matters, the initial work of identifying the cases and obtaining the basic information is administrative. It is within the ambit of the trustee's duties.
The second question is the necessity of the legal work expended. CLC was the defendant in all five matters. The two district court suits were clearly stayed as to the debtor.[12] 11 U.S.C. § 362. Only one of the three human rights agencies refused to acknowledge that it would honor the automatic stay, apparently asserting that its investigation was an exercise of the state's police power. It, however, has taken no further action. Almost all of the work was done before the bar date for filing proofs of claims had expired. More than $10,000 was spent to evaluate claims, four of which never matured into proofs of claims. Without a timely filed proof of claim, the estate has no interest in the outcome of the investigations or the law suits. There can be no per se rule in these circumstances  that is, whether legal services should be performed before a proof of claim is filed. The trustee needs discretion to evaluate legal matters at an early stage. It is not clear, however, that counsel's work benefitted the estate. It is possible that counsel's efforts convinced four claimants to abandon their claims and not file proofs of claims, thereby avoiding a later contest over objections to proofs of claims.[13] However, even this is not clear as one claimant did file a proof of claim.
*910 The third question is the reasonableness of the amount of time expended on the Employment Law Matters. One factor is the amount in controversy. As stated above, only one proof of claim was filed. It asserts a claim in the amount of $200,000. While the final distribution to creditors cannot be known with certainty at this time, general unsecured creditors are not likely to receive a distribution greater than 10 or 20 percent. The amount of preliminary legal fees expended on these matters is a significant percent of the maximum distribution on the filed proof of claim. It is not clear if counsel's efforts dissuaded the filing of the other four proofs of claims. However, in reviewing the time records as a whole, the court finds that the services rendered were not completed within a reasonable amount of time. The services rendered were essentially a review of five employment matters with the intention of advising the trustee on a course of action. This should not have consumed the amount of time expended.
After having considered the Johnson factors and the distinction between work that the trustee must perform and legal work for which counsel may be compensated, the court will allow all of the fee requested for the Employment Law Matters billing task, but reduced by $4,000.
There are several items in the fee application that cannot be approved. The page rates for photocopies and telecopies are not disclosed. Counsel must disclose the page rates or the requested expenses will be disallowed because the court cannot determine whether they are reasonable. It is the applicant's burden to show that expenses are both necessary and reasonable. Local mileage is not an allowable expense. Non-local travel time is a more difficult issue. There is diversity in the practices of bankruptcy courts regarding the reimbursement of non-local travel expenses. Some courts allow all of it; others allow none, treating travel time as part of an attorney's overhead. Others recognize that a lawyer cannot represent a client unless he is in the right place at the right time and that the lawyer could have been back in the office billing another client rather than being on the road. Each approach has its own appeal. This court has historically allowed one-half the reasonable travel time unless legal work is actually performed during the trip. However, the trip must be necessary. Alternatives must be considered and, if appropriate, used.
All expenses requested will be allowed except for one-half non-local travel in the amount of $1,387.50, local travel in the amount of $22.85, and photocopies and telecopies for which no per page rate was disclosed.

III. Dow, Lohnes & Albertson, PLLC Fee Application
Dow, Lohnes & Albertson, PLLC was retained as special counsel for education regulatory matters by order entered on February 8, 2001. The scope of the proposed services described in the application was vague, however, it was clear that the trustee needed counsel experienced in education law. The application was approved, but compensation was limited to a maximum of $10,000. In less than a month, the trustee requested that the budget for special counsel be increased to $30,000. Fees incurred through February 22, 2001, the date of the request for the increased budget, were $18,000. The requested increase was approved. The trustee was at that time actively seeking to *911 sell the schools as going concerns, but the Department of Education asserted that any purchaser would be ineligible to participate in federal educational loan programs because of the disqualification of the debtor. The disqualification followed the assets. The trustee and special counsel sought to convince the Department of Education that the disqualification should be waived. It was expected that the schools would be substantially more valuable if the disqualification were waived. Michael B. Goldstein of Dow Lohnes, working with the trustee, was successful in this endeavor. The trustee was able to sell the schools for a greatly enhanced value. The results obtained in the compressed time available were excellent.
Dow Lohnes' first fee application sought $76,571.50 for fees and $2,667.03 for expenses for the period from January 25, 2001, the date of the filing of the petition, through May 31, 2001. The United States Trustee objected because the application far exceeded the $30,000 maximum previously established. The court was satisfied that the combination of the trustee's bankruptcy expertise and Mr. Goldstein's expertise, coupled with the Department of Education's own self-interest[14] and the best interests of the students enrolled in CLC classes at the time, resulted in the remarkable achievement. During that period, there was little time to make a further application to increase the budgeted compensation. All of the parties were working feverishly to sell the schools, which were, effectively, perishable commodities. The budgeted amount would have been increased had a motion been made. To have denied the fee application would have penalized special counsel and required additional unnecessary work that would have had a fairly predicable result. Given all the circumstances, particularly the lack of time and the propriety of the relief that should have been requested, the application, with only minor adjustments, was approved.
All substantial organizations operate from a budget. The budget making process requires management to look forward to determine where they would like to go. It establishes the means of how the organization will get there. During the year, the budget provides benchmarks and permits a fair evaluation of where the organization has been and where it has yet to go. The budgeted amount for Dow Lohnes was intended to achieve these objectives as well. Both the trustee and special counsel must be aware of the budget limits if they are to be effective. Counsel needs to be sensitive to the progress and expense of the work undertaken and keep the trustee advised particularly as he approaches the limit in the employment order. The beneficiary of the limit, though, is the trustee. "To properly perform the duties necessary for an orderly and efficient administration, a trustee is expected at all times to exercise sound business judgment, especially when incurring expenses to be paid from the assets of the estate." In re Wake, 222 B.R. 35, 39 (Bankr.W.D.N.Y.1998). A budget limit in an employment order protects him from unanticipated expenses that might be avoidable or may, when they become apparent, cause him to reconsider the matter. Every trustee must be, and this trustee is, sensitive to both the need for competent counsel and the associated administrative expense. "A balance must be struck between two competing interests: that the cost of bankruptcy should not itself consume the very res the proceedings are designed to protect; and that fees allowed be such as not to discourage competent *912 counsel from active and effective participation." Jacobowitz v. Double Seven Corp., 378 F.2d 405, 409 (9th Cir.1967) (Merrill, J., dissenting) (Bankruptcy Act case increasing attorney's fee awarded on incorrect application of economy of administration standard). A budget limitation assists in reaching this balance. It provides the trustee with the ability to control and properly manage professionals.
No motion to increase the budget over $30,000 has been filed. The court is now faced with the second interim application for Dow Lohnes. Special counsel requests $10,586.00 for fees and $544.42 for expenses. The United States Trustee did not object to this application even though it exceeds the budget cap, perhaps because he believed that budget caps are not enforced and are meaningless. Therein lies the first problem. If budget caps are to have any meaning, they must be enforced. But, if this budget cap is strictly enforced, counsel whose work benefitted the estate will be prejudiced. Budget caps are not intended to be inflexibly applied. If circumstances change, they can be modified. In fact, the initial cap here was increased from $10,000 to $30,000 and would have been increased to $76,000 had a proper motion been made.
At the hearing on the fee application, the trustee orally requested that the budget cap be increased to permit the payment of the fees requested. The circumstances are different now than at the time of the first fee application. During the first fee application period, both the trustee and special counsel were consumed with the sale of the schools. Almost all of their attention was directed to that effort. It would have been perverse to have penalized either of them for placing their dedication to the estate over their own self-interest. But, the all-consuming nature of the case abated by April 2001, with the sales of the schools. Both knew from at least May 31, 2001, that the budget cap had been exceeded. There was ample time to seek an increase. The trustee is the party who must seek the increase and did not do so. He offered no explanation.
This does not mean that the court cannot exercise its equitable powers to consider raising the budget cap again. The first fee application was granted notwithstanding the budget cap in part because of the excellent result obtained which was self-evident. Some of the time expended during the second fee application period was related to the matters undertaken during the first period and sought to complete them. This is primarily the time relating to the disposition of student records that the trustee did not sell. Student records are important to the former students. The trustee is in the process of disposing of them, principally to state government repositories. This time can be considered part of the sales effort and should be treated in the same manner as the time on the first fee application, that is, be allowed notwithstanding the budget cap.
There was, however, a whole new area undertaken by Dow Lohnes. About half of the second fee application relates to time expended on insurance matters, principally communicating with McKenna & Cuneo, reviewing its files and preparing them for transmittal to McKenna & Cuneo and providing information concerning matters in which it had been involved so that McKenna & Cuneo could advise the trustee with respect to insurance coverage and other insurance related matters. Much of this work is outside the scope of the employment of Dow Lohnes which was retained as special counsel on federal and state education regulatory matters. This is partially recognized by the trustee in the second fee application. The trustee stated:

*913 As explained in detail below, during the [second] Interim Period, Dow Lohnes has worked diligently with the Trustee, the Debtor and other professionals and creditors in order to liquidate the assets of the Debtor.
Application, ¶ 4 (Docket Entry 492).
Dow Lohnes was not engaged as general counsel to the trustee to generally assist the trustee in liquidating the estate; the trustee's own law firm was retained for this purpose. Dow Lohnes was not engaged with respect to insurance matters, but rather education regulatory matters. Clearly defined scopes of employment in the employment application and budget caps in the employment order are designed to keep special counsel within the parameters of the task for which they were employed. In this case, Dow Lohnes did not initiate the insurance work. It was initiated by the trustee directly and through McKenna & Cuneo.[15] The court is faced with the situation of Dow Lohnes exceeding the scope of its employment by working with a law firm whose employment application had not been submitted to the court and has now been denied. There is no reason why Dow Lohnes should have known of the unauthorized status of McKenna & Cuneo or should have inquired. But, is should have been sensitive to the limited scope of its employment.
The court is satisfied that Dow Lohnes exercised sound professional judgment in the time it expended on the tasks it undertook. In ordinary circumstances, the fee application, to the extent that the services rendered were within the scope of the firm's employment, would, with one exception have been approved as submitted. The exception concerns the time entries on the insurance task that state, "Review of documents and preparation of files for McKenna & Cuneo" and "Work on obtaining files." These services are billed at $195.00 and $380.00 per hour. They appear to have been administrative in nature and, if allowed, would be allowed at clerical rates only.
In consideration of all the circumstances presented, the court will increase the budget cap almost enough to permit payment for the services covered by the fee application except for insurance work not related to education regulatory advice. In light of the failure to seek a timely increase in the budget cap, the budget cap will not be increased to pay all the requested fees that would otherwise have been approved. The difference will be modest.[16] However, no further fees will be approved in excess of the budget cap. If further work is required, the budget cap must be increased in advance of the services to be rendered.
NOTES
[1] The debtor was unable to reorganize. The United States Department of Education asserted a liability of $187,000,000 for various violations of Title IV of the Higher Education Act of 1965. The Department originally took the position that any purchaser of a school would not be eligible to participate, at the school purchased, in federal student financial assistance programs authorized by Title IV for a period of two years after the purchase of the "tainted" assets. Participation is essential to most schools like CLC. This position  which is well supported by statute and regulation  substantially limited the value of the assets and effectively precluded going concern sales. Based on this position, the debtor estimated that the liquidation value of its assets was under $6,000,000. The trustee, with the able assistance of Michael B. Goldstein of Dow, Lohnes & Albertson, PLLC, convinced the Department that it was in the government's and the students' best interests to waive the disqualification. With the waiver, which was approved by the court on March 7, 2001, the trustee received $20,000,000 from the sale of the schools. The debtor would not have been able to have effected this settlement.
[2] The trustee retained his own law firm, Gold Morrison & Laughlin, as general counsel; Pepper Hamilton as special counsel for securities law matters and specific litigation; Dow, Lohnes & Albertson as special counsel for education law matters; Ridberg, Press & Sherbill, effectively, as a temporary assistant general counsel; Bosley Hutzelman as special counsel for pension plan matters; Frank & Company as accountant; and an auctioneer. To date, Gold Morrison & Laughlin has requested fees of $367,016.50 and expenses of $69,707.81; Dow, Lohnes & Albertson, $87,157.50 and $3,211.45; Ridbery, Press & Sherbill, $23,725.00 and $58.25; Bosley Hutzelman, $60,937.50 and $2,013.34; Frank & Company, $482,920.85 and $22,215.73; and the trustee, $195,677.25 for trustee fees. The auctioneer requested fees of $1,967,772.00 and expenses of $51,505.02 but was awarded fees of $941,979.16 and expenses of $48,079.62.
[3] "Judges should feel no compunctions about requiring trustees to justify their retention of professionals, and to deny approval when the facts and circumstances of the case confirm that the particular duty can be done effectively by the trustee herself without assistance." Abraham, 163 B.R. at 778-79.
[4] Section 328(b) states:

If the court has authorized a trustee to serve as an attorney or accountant for the estate under section 327(d) of this title, the court may allow compensation for the trustee's services as such attorney or accountant only to the extent that the trustee performed services as attorney or accountant for the estate and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney or accountant for the estate.
[5] This does not prohibit the trustee himself from hiring staff or others to physically perform these functions. However, the trustee bears the expense of his staff in performing his duties. In re Hagan, 145 B.R. 515, 519 (Bankr.E.D.Va.1992) (Shelley, J.) ("[I]f the trustee needed a paralegal to perform trustee duties that the trustee would otherwise have to perform, then no court approval [of employment of the paralegal] is necessary, but the paralegal's compensation comes out of the trustee's statutory payment.") But see, In re Abraham, 163 B.R. 772, 792 (Bankr.W.D.Tex.1994) (holding that paralegal expenses are compensable without regard to cap on trustee's compensation, noting, however, that "[a] trustee's own compensation, meanwhile, capped by section 326(a), may (perhaps should) vary depending on the extent to which her duties have been delegated to others.")
[6] The appointment standards for special counsel are less stringent than for general counsel. The usual standard under § 327(a) requires the applicant to be a disinterested person and not hold or represent an interest adverse to the estate. Section 327(e) eliminates the disinterested requirement and limits the adverse interest test to the "matter on which such attorney is to be employed."
[7] At $375 per hour, the firm would have to expend more than 4.444 hours (more than two lawyer-years) to earn $1.67 million. If the anticipated time for the case were 2,000 hours, the firm would be paid  if it were successful in recovering $10 million  $3,733,333.00, about $3.3 million from the contingency and $400,000 from the proposed reduced hourly rate of $200. That is an hourly fee of $1,866.67. Win, lose or draw, the estate would be liable for $400,000 plus expenses. Under an hourly rate employment, the case, if it were to take 2,000 hours, would cost the estate $750,000. Is saving $350,000 if the case is lost worth paying a $3 million premium if the case is won? An analysis of these options is necessary to determine whether a contingent fee is appropriate.
[8] The supporting time records for Pepper Hamilton's first interim fee application were unilaterally filed under seal because the trustee asserted that they were privileged. While time records may contain privileged material, they must nonetheless provide the basis for the requested fees. Chaudhry v. Gallerizzo, 174 F.3d 394, 402 (4th Cir.1999); In re Grand Jury Proceedings, Thursday Special Grand Jury September Term, 1991, 33 F.3d 342, 354 (4th Cir.1994). They should reflect the attorney who performed the services, the date of the services, the amount of time expended and a description of the services. It is not required that the actual communication between the attorney and the client be revealed in the time records. Privileged material is not usually included in original time records; however, if it is included in the firm's copy of the time records, it may be redacted from the filed document. Nonetheless, sufficient non-privileged information must be provided so that the court can evaluate the application.

Pepper Hamilton did not follow this established procedure. The time records filed under seal aggregated more than 85 hours of legal services provided over more than 30 days into a single 19-line narrative description. There was no indication who performed what service on a particular date or the time expended. Nor was any portion of the narrative privileged. It revealed no privileged communications. The narrative stated, for example, that Pepper Hamilton "discussed the facts, theories, and status of the matter with former counsel"; "reviewed the file"; "arranged for the case files to be transferred to Pepper Hamilton LLP"; "reviewed procedures of the U.S.D.Ct. for New Jersey"; "obtained and reviewed the court docket sheet"; "discussed the options with counsel for the Trustee and the Trustee's Counsel" (sic); "prepared notice of appearances and pro hac vice motions and orders"; "reviewed files re trial strategy and considered trial strategy"; and "prepared a 30 page letter to the Trustee regarding the facts, theories, status of the matter and initial recommendations for trial preparation and settlement strategy".
The document filed under seal was wholly insufficient to support the fee application. Moreover, filing it under seal deprived interested creditors from any meaningful review of the fee application. They, of course, are the very ones who are, effectively, paying Pepper Hamilton. The court issued a rule to show cause why the time records should not be unsealed and filed among the public papers of this case. Despite the trustee's continued assertion of attorney-client privilege, the document was ordered to be filed among the public papers of this case. (Docket Entry No. 484). The fee application was denied without prejudice and is now again before the court, this time with proper time records.
[9] Not every action commenced by a chapter 7 trustee will be successful. Neither the trustee nor his counsel should be penalized for pursuing apparently worthwhile claims that fail to materialize. Consequently, the focus should be at the time the services are rendered. 11 U.S.C. § 330(a)(3)(C). Otherwise, an obstreperous opponent may erroneously conclude that if he is successful in delaying the inevitable and increasing the trustee's costs, the trustee will settle for less to preserve his fee or, even fade away.
[10] While the application is proper, the court is concerned with the magnitude of the fees charged to date and the potential magnitude of future fees. CLC filed suit against KMO-361 and others in the United States District Court for the District of New Jersey on August 27, 1998. A motion for partial summary judgment had been argued and a 109-page final pretrial order entered. The case was apparently administratively dismissed in August 2001. Neither the original complaint in New Jersey nor the complaint filed in this court reflect a novel legal theory. While millions of dollars are in issue, the case is not unusually complex. Pepper Hamilton billed $30,402.50 to this matter through August 6, 2001, almost all within a single 30-day period. This essentially was a review of the case that culminated in a 30-page letter to the trustee. The complaint in this court was filed on November 14, 2001. Counsel in the New Jersey suit filed a proof of claim for $89,833.03 for services rendered from January 2, 2001 through January 23, 2001.
[11] Much of the communication was with an attorney in the trustee's law firm who acted as a liaison between special counsel and the trustee. His time is included in the pending fee application for the trustee's law firm. See King, 88 B.R. at 772.
[12] There were additional defendants, former employees whose conduct allegedly created the liability. Pepper Hamilton expended time to determine whether CLC should defend the former employees.
[13] The advice to notify the insurance carrier of the claims was something that the trustee should have considered without the intervention of legal counsel. Knowledge of the debtor's insurance situation is an administrative matter for the trustee.
[14] The Department asserts the single largest claim, approximately $187 million.
[15] Most of the insurance work was done before McKenna & Cuneo's employment application was filed with the court. All the insurance work was done before McKenna & Cuneo's employment application was denied.
[16] The trustee also bears responsibility for allowing the budget limitation to be exceeded. This matter is better addressed when the trustee's application for compensation is considered.